**UNITED STATES of America ex rel. Janet C. OLIVER, Plaintiff,**

v.

**THE PARSONS CORPORATION, Engineering Science Inc., Parsons Engineering Science Inc., and Inspection and Maintenance Corporation, Defendants.**

**No. CV 95 5423 DT SHX.**

United States District Court, C.D. California.

Dec. 19, 2006.

Dean Francis Pace, Pace & Rose, Los Angeles, CA, Donald R. Warren, Phillip E. Benson, Warren–Benson Law Group, Newport Beach, CA, for Plaintiff.

Dale H. Oliver, Jon D. Corey, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, Samuel B Shepherd, Quinn Emanuel Urquhart Oliver & Hedges, Redwood Shores, CA, Joseph N. Akrotirianakis, AUSA–US Attorney Office, Riverside, CA, for Defendants.

TEVRIZIAN, District Judge.

## I. Background

### A. Factual Summary

From 1992 to 1995, Plaintiff and Relator Janet C. Oliver ("Plaintiff") was employed

as a Government Accounting Specialist by Defendant Engineering Science Inc./Parsons Engineering Science Inc. (collectively referred to as "Parsons ES")[1], a subsidiary of The Parsons Corporation ("TPC"). (First Amended Complaint ("FAC") ¶ 3); *United States ex rel. Oliver v. The Parsons Co.*, 195 F.3d 457, 461 (9th Cir.1999) (as amended October 22, 1999), *cert. denied sub nom. Parsons Corp. v. United States ex rel. Oliver*, 530 U.S. 1228, 120 S.Ct. 2657, 147 L.Ed.2d 272 (2000). On August 14, 1995, Plaintiff filed this suit in the name of the federal government under the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729–3730. *Oliver*, 195 F.3d at 461. The United States government declined to intervene. *Id.* Plaintiff seeks a share of any proceeds from the action pursuant to 31 U.S.C. § 3730(d)(1)-(2). (FAC ¶ 30; *see also* Order Denying Defendants' Motion for Summary Judgment, Case No. CV 95–5423 WMB (SHx) (C.D.Cal. Mar. 2, 2001) ("2001 Summ. Judg. Ord."), p. 2). She alleges that, from 1989 to 1997, TPC, along with certain of its subsidiaries and segments,[2] (collectively "Defendants"), knowingly violated the federal Cost Accounting Standards ("CAS") in an effort to overcharge the government, thereby giving rise to a claim under the False Claims Act. *Oliver*, 195 F.3d at 460; (*see also* FAC ¶ 6.)

Parsons ES is a significant federal government contractor, with contracts amounting to over $300 million between 1989 and 1996. *Oliver*, 195 F.3d at 461. In August 1989, the State of California awarded Parsons ES a $58 million contract to operate part of its air quality emissions program ("the BAR Contract"). *Id.* Par-

sons ES then awarded a subcontract to Inspection and Maintenance Corporation ("I & M"), another wholly-owned subsidiary of TPC. *Id.* Pursuant to the contract, and even after such written contract expired on December 31, 1991, I & M performed the "field and supervisory work" associated with the BAR Contract. *Id.* I & M has only one corporate objective—work under the BAR Contract—and consists solely of employees who directly implement that contract. *Id.* Accordingly, I & M does no work for the federal government. *Id.*

For accounting purposes, I & M labor costs were not included in Parsons ES' direct labor base cost. *Id.* Rather, they were characterized as "other direct costs" arising from the subcontract. *Id.* Parsons ES calculates the overhead rate that it charges the federal government under its federal contracts as a percentage of the difference between the direct labor base and the "overhead pool costs." *Id.* "For example, if Parsons ES's direct labor base cost is $100 and the overhead pool money amounted to $150, the overhead rate is 150%. If its direct labor base cost was increased to $150, then the overhead rate charged to the government is 100%." *Id.* Therefore, Plaintiff alleges that Parsons ES created I & M, as a sham corporation with no overhead to which labor costs could be attributed, in order to reduce its own direct labor costs and thereby increase the overhead rate billed to the federal government. *Id.*; (*see also* 2001 Summ. Judg. Ord. at 1.) In essence, Plaintiff contends that Defendants engaged in a scheme to withhold from the federal

---

1. On October 1, 1994, Engineering Science Inc. changed its name to Parsons Engineering Science Inc. (Joint Stipulation of Facts ("Jt. Stip.") No. 3, Declaration of Dean Francis Pace in Support of Plaintiff's Motion for Summary Judgment ("Pace Decl.") Exh. B).

2. Specifically, Plaintiff names Engineering Science Inc., Parsons Engineering Science Inc., and Inspection and Maintenance Corporation ("I & M"). (First Amended Complaint ("FAC") ¶ 3).

government material information on the existence of transfers between two subsidiaries of the same parent corporation, in order to permit the subsidiary with federal contracts (Parsons ES) to shift its non-federal labor costs onto the other subsidiary (I & M) and to receive compensation for its federal overhead costs at an excessive rate. (2001 Summ. Judg. Ord. at 1–2).

On August 1, 1997, the Court (Judge Matthew Byrne) denied Plaintiff's motion for summary judgment and granted summary judgment to Defendants "on the ground that since their interpretation of the controlling regulations was reasonable, their claims could not be considered 'false or fraudulent' despite any nondisclosure." (2001 Summ. Judg. Ord. at 2). The Ninth Circuit reversed the grant of summary judgment, finding the "reasonable interpretation" analysis to be erroneous as a matter of law. (*Id.*); *see also Oliver*, 195 F.3d at 463. However, the Ninth Circuit declined to reach the issue of "whether Parsons' accounting measures complied with the Cost Accounting Standards," and remanded for further proceedings on this issue. *Id.* Judge Byrne previously found that the Ninth Circuit held that Plaintiff

had come forward with sufficient evidence to preclude summary judgment on the issue of Defendants' knowledge that false or fraudulent claims were being submitted to the government. (2001 Summ. Judg. Ord. at 2); *see also Oliver*, 195 F.3d at 465.

In late 2000, Defendants again moved for summary judgment on the grounds that: (1) the allegedly false claims were not "false or fraudulent" because the alleged unlawfulness of a subcontract between Parsons ES and I & M could not support Plaintiff's claims; and (2) they violated no specific Federal Acquisition Regulation ("FAR"), Cost Accounting Standard ("CAS"), or other federal statute or regulation, because their treatment of I & M was mandated by CAS and the disclosures challenged by Plaintiff were neither false nor fraudulent. (2001 Summ. Judg. Ord. at 2). Judge Byrne then denied summary judgment on the grounds that Defendants' arguments already had been rejected by the Ninth Circuit. (*Id.* at 2). The parties have now filed cross-motions for summary judgment, which are now before this Court.

The following facts submitted by the respective parties are undisputed unless otherwise noted:[3]

---

**3.** Central District of California Local Rule 56–1, ("L.R. 56–1"), states that with each motion for summary judgment filed pursuant to Fed. R.Civ.P. 56, the moving party shall lodge a proposed Statement of Uncontroverted Facts and Conclusions of Law. "Such proposed statement shall set forth the material facts as to which the moving party contends there is no genuine issue." (L.R. 56–1). Central District of California Local Rule 56–3 ("L.R. 56–3") further provides that:

> In determining any motion for summary judgment, the Court will assume that the material facts as claimed *and adequately supported by the moving party* are admitted to exist without controversy except to the extent that such material facts are (a) included in the "Statement of Genuine Issues" and (b) controverted by declaration

or other written evidence filed in opposition to the motion.

(L.R. 56–3) (emphasis added). Plaintiff's purported Statement of Uncontroverted Facts and Conclusions of Law is simply an often unintelligible restatement of her Memorandum of Points and Authorities in support of her Motion for Summary Judgment. Plaintiff makes no effort whatsoever to clearly set forth only the material *facts*. Where Plaintiff does cite to evidence, those citations are often buried in text and undecipherable. In many instances, Plaintiff simply fails to make a citation to evidence at all. Therefore, the Court has disregarded Plaintiff's proposed "uncontroverted facts" where they: (1) are not supported by admissible evidence; or (2) are based on evidence which cannot be located by

The only intercompany subcontract ever made by Parsons ES was to I & M. (Joint Stipulation of Facts ("Jt. Stip."), No. 113, Declaration of Dean Francis Pace in support of Plaintiff's Motion for Summary Judgment ("Pace Decl.") Exh. B). "Evidence in the record demonstrates that Parsons ES failed to list I & M among the companies with whom it engaged in inter-organizational transfers." *Oliver*, 195 F.3d at 465. The language of the relevant Disclosure Statements, section 2.8.0 states:

Inter-organizational Transfers.

This item is directed only to those materials, supplies, and services which are, or will be transferred to you from divisions, subsidiaries, or affiliates under common control with you.

([I]ndicate the basis used by you as transferee to charge the cost of materials, supplies, and services to Government contracts of similar cost objectives.)

*Id.* "In response, Parsons ES submitted a list of companies it stated 'included' but was not 'limited to' the companies with which it had interorganizational transfers." *Id.* "Parsons ES did not list I & M among these companies, despite the fact that it was required to provide a 'complete and accurate' disclosure under the regulations." *Id.* (citing 48 C.F.R. § 9903.202–10 (1999)).

While in her position as a government accounting specialist for Parsons ES, Plaintiff immediately contacted the appropriate officers upon discovering the existence of I & M. (Declaration of Janet C. Oliver ("Oliver Decl."), 1:25–3:20, Pace

Decl. Exh. D). They told her to "forget about it." (*Id.* at 2:15–18). Plaintiff replied that Parsons better hope the Defense Contract Audit Agency ("DCAA") doesn't discover I & M. (*Id.* at 2:18–19). The reason why Plaintiff said that was "because she knew that DCAA was upset what [sic] the DCAA Auditors discovered during a floorcheck in 1992 that Parsons ES was providing services (Accounting, Human Resources, etc.) to intercompanies ...." (*Id.* at 2:19–23). Because of that discovery, DCAA asked Parsons ES to produce a list of all Parsons interorganizational companies for which Parsons ES performed services. (*Id.* at 2:24–26). Parsons ES provided this list to the DCAA. (*Id.* at 2:26–27). However, I & M was excluded from this list even though I & M had been transferring labor and fringe benefits intercompany to Parsons ES since 1989. (*Id.* at 2:27–3:1). Defendants do not directly contradict Plaintiff's testimony, but point to other testimony that Parsons ES simply listed certain companies for illustrative purposes, and that Parsons ES specifically told the DCAA that the list was not all inclusive by including the words "include but not limited to." (Deposition of Dan Schiff, July 3, 2001 ("Schiff Depo."), 188:10–16, Supplemental Declaration of Joseph N. Akrotirianakis ("Supp. Akro. Decl.") Exh. B; Deposition of Malcom K. Holdsworth ("Holdsworth Depo."), September 12, 2001, 42:12–43:20, Supp. Akro. Decl. Exh. D). Additionally, Defendants cite the testimony of Michal Kerestes, a DCAA auditor, that she understood that the list of Parsons companies was only partial.[4] (Declaration of Michal

---

the Court through the citation and/or a reasonable search of the papers submitted.

4. In her declaration, Kerestes states as follows:

In approximately the Fall of 1994, I asked Dan Schiff of Parsons for a list of the Parsons companies with which Parsons ES en-

gaged in interorganizational transfers. I understood that the list of Parsons companies in Parsons ES' response to Item 2.8.0 in Parsons ES' Disclosure Statement dated December 31, 1994 was a partial response to my inquiry. I never received any com-

Kerestes ("Kerestes Decl."), ¶ 3, Declaration of Joseph N. Akrotirianakis in support of Defendants' Motion for Summary Judgment ("Akro. Decl.") Exh. F). Plaintiff was told that the I & M company was set up so that Parsons ES would not have to include the direct labor in the Parsons ES direct labor base for computation of the overhead rate which is invoiced on United States Government contracts. (Oliver Decl. at 3:7–11).

Defendants have stipulated that the "intercompany subcontracts" between Parsons ES and other subsidiaries of The Parsons Corporation were certified as "Intercompany transfers at cost." (2001 Summ. Judg. Ord. at 10:19–21). Specifically, after the word "subcontract" there is an asterisk (*) at Paragraph 2.8.0 Inter-organizational Transfers of the Parsons ES Certified CASB Disclosure Statement required by Public Law 100–679, and the asterisk (*) specifies: " * Intercompany transfers at cost." (Jt. Stip. No. 48, Pace Decl. Exh. B). Parsons ES did not disclose I & M in the Parsons ES certified CASB Disclosure Statement required by Public Law 100–679. (*Id.* at No. 26). Section 2.8.0 Inter-organizational Transfers of the Parsons ES certified CASB Disclosure Statement dated May 27, 1994 has twenty asterisk marks on the right side of the text, which indicate revisions. (Pace Decl. Exh. C). Seven of the asterisk marks are to the right of the listing of the Parsons ES Interorganizational Transfers by name, none of which are the I & M subcontract. (*Id.*).

The I & M Inter-organizational Transfers were not "at cost," but with a 90% "multiplier" (120% for two years). (Subcontract between Parsons ES and I & M ("I & M Subcontract"), p. 8, Pace Decl. Exh. H). The I & M Subcontract defines the "multiplier" as including overhead, fringe and fee for profit. (*Id.*) The I & M invoices to Parsons ES were only for the incurred I & M technician labor cost and the multiplier which included profit and, therefore, were not transferred at cost. (Pace Decl. Exh. I; Defendants' Objections and Responses to Plaintiff Janet Oliver's Third Set of Special Interrogatories ("Interrog."), No. 19, Pace Decl. Exh. J). Defendants contend, however, that the "at cost" language in Parsons ES' Disclosure Statement refers to Parsons ES' costs (as the transferee or disclosing entity) and not I & M's costs. (February 5, 1992 Disclosure Statement ("1992 Discl. Stat."), p. 6, Akro. Decl. Exh. T at 424; May 27, 1994 Disclosure Statement ("1994 Discl. Stat."), p. 9, Akro. Decl. Exh. U at 464, 494; Deposition of Robert William Jones, March 31, 1997, ("Jones Depo."), 29:18–32:18, Supp. Akro. Decl. Exh. C). The 90% and 120% multiplier was based on what the competitive market would stand.[5] (Deposition of Phillip James Morris, March 25, 1997 ("Morris Depo."), 49:19–51:7, 53:2–15, Pace Decl. Exh. K).

I & M has no incurred or allocated burden expense for overhead as reflected in the 1990–1997 I & M annual Income Statements. (Pace Decl. Exh. L at 149, 153, 160, 170, 173, 176, 179, & 182). Defendants point out, though, that I & M income statements do show burden expenses/costs for fringe benefits.[6] (Pace

---

plete response to my inquiry, and to my knowledge, no one else at DCAA did either. (Declaration of Michal Kerestes ("Kerestes Decl."), ¶ 3, Akro. Decl. Exh. F).

**5.** The citation provided by Plaintiff, pages 15–16 of the Morris deposition transcript, does not support this assertion. However, the

Court was able to locate supporting testimony at pages 49 through 53 of the Morris deposition transcript.

**6.** Defendants incorrectly cite Exh. K of the Pace Declaration for supporting evidence. However, the Court was able to locate the

Decl. Exh. L at 152, 157, 164, & 169). The 90% to 120% multiplier has consisted only of approximately 32% fringe benefit cost and 58% to 88% profit. (Morris Depo. at 52:3–53:1, Pace Decl. Exh. K).

Federal Acquisition Regulation § 52.230–1 states as follows: "CAUTION: In the absence of specific regulations or agreement, a practice disclosed in a Disclosure Statement shall not, by virtue of such disclosure, be deemed to be proper, approved, or agreed-to practice for pricing proposals or accumulating and reporting contract performance cost data." (F.A.R. § 52.230–1, Pace Decl. Exh. E).

As of 1997, the I & M Balance Sheet contained an I & M asset entitled Intercompany Accounts (which comprised the net worth of I & M). (Pace Decl. Exh. N at 192). The Parties agree that such Intercompany Account was in the amount of $15,829,654.[7] (Id.) As of 2004, TPC still had a liability on its books for payment of approximately $16 million to I & M on the I & M Intercompany Account. (Deposition of Russell C. Loman, Vol. II, September 9, 2004 ("Loman Depo. II"), 208:18–211:20, Pace Decl. Exh. O).

The certified Parsons ES CASB Disclosure Statement expressly provided concerning the allocation of Overhead and G & A to intercompany subcontract transfers that:

(1) If contractual arrangements provide that these costs be treated as intercompany subcontract transfers of costs, the costs billed by the affiliated companies are charged to the other direct cost accounts. Labor is burdened with applicable overhead, fringe and G & A expenses.

(Pace Decl. Exh. R at 252). Section 2.8.0 of the Parsons ES Disclosure Statement certifies that: "In all other instances, the labor of employees of affiliated companies [of Parsons ES divisions] is charged to the direct labor account at actual hourly rate times the number of hours charged to the projects." (Jt. Stip. No. 25, Pace Decl. Exh. B; Pace Decl. Exh. C at 59). Plaintiff contends, without citing any supporting evidence, that this should include transfers *not* at cost pursuant to interorganizational subcontracts. Defendants, on the other hand, disagree that invoices issued pursuant to an intercompany subcontract for an amount greater than the transferee's "cost" are subject to this language. (Jones Depo. at 30:21–32:7, Supp. Akro. Decl. Exh. C). Rather, they argue that their practices are consistent with the language in the Parsons ES Disclosure Statement, which immediately follows the challenged language: "Overhead and fees on intercompany labor are not pyramided[,] duplicated, or double-billed on government contracts." (Akro. Decl. Exh. T at 446).

The Parsons ES labor for the overhead functions, activities and expenses was never transferred to I & M. (Jt. Stip. Nos. 31–43, Pace Decl. Exh. B). Such costs incurred by Parsons ES for the benefit of I & M include: rent (Parsons ES provides the facilities where the I & M BAR technicians work and negotiates and signs the lease for the buildings in which the I & M BAR technicians work); providing conference facilities for I & M BAR technician monthly meetings; office equipment; license and fees; reproduction costs; office and consumable supplies; automobile travel and subsistence (Parsons ES pays for the I & M BAR technicians' mileage, park-

supporting evidence in Exh. L of the Pace Declaration.

7. The Court notes, however, that the evidence cited reflects an Intercompany Accounts balance of $15,725,891.23. (Pace Decl. Exh. N at 192).

ing and tolls); communication/telephone; freight, express, and postage; maintenance and repair; utilities; training and development; publications and periodicals; bank charges; and janitorial services. (Loman Depo. II at 179:18–193:23; Jt. Stip. Nos. 31–43, Pace Decl. Exh. B).

I & M invoices submitted to Parsons ES were paid by either check or wire transfer. (Deposition of Russell Craig Loman, August 26, 2004 ("Loman Depo."), 36:1–7, Pace Decl. Exh. O). The Ralph M. Parsons Company ("RMP"), Parsons Process, and/or TPC received the checks or wire transfers on behalf of I & M and deposited them into a RMP or TPC bank account. (*Id.* at 36:14–42:4; *see also* Jt. Stip. Nos. 81–83, Pace Decl. Exh. B). Russell C. Loman's labor in preparation of the I & M general ledgers and financial statements was allocated to direct labor in the RMP general ledger. (Loman Depo. 78:11–79:12, Pace Decl. Exh. P; Deposition of Russell C. Loman Volume IV, November 13, 2001 ("Loman Depo. IV"), 173:1–15, Pace Decl. Exh. P).

For the years 1989–1997, the overhead rates which Parsons ES utilized for cost reimbursement vouchers, progress payment invoices, and certifications of costs submitted to the United States Government would have been lower if the I & M technician labor was included in the direct labor base utilized to compute the Parsons ES overhead rates and overhead amounts submitted to the United States Government and paid by the United States Government in a total sum of $6 million. (First Supplemental Joint Stipulation of Facts ("Supp. Jt. Stip.") No. 120, Akro. Decl. Exh. B). From 1989 to 1997, Par-

sons ES submitted to the United States Government 1,314 cost reimbursement vouchers paid by the United States Government, all of which contained overhead which did not include the I & M technician labor in the Parsons ES direct labor bases utilized to compute the Parsons ES overhead rates and overhead dollar amounts. (*Id.* at No. 116). From 1989 to 1997, Parsons ES submitted to the United States Government 2,126 progress payment invoices paid by the United States Government, all of which contained overhead which did not include the I & M technician labor in the Parsons ES direct labor bases utilized to compute the Parsons ES overhead rates and overhead dollar amounts. (*Id.* at No. 117). From 1989 to 1997, Parsons ES submitted 616 certifications of costs to the United States Government, all of which involved certification of overhead which did not include the I & M technician labor in the Parsons ES direct labor bases utilized to compute the Parsons ES overhead rates and overhead dollar amounts. (*Id.* at No. 118). From 1989 to 1997, I & M had no other business than the interorganizational transfers to Parsons ES on the BAR contract. (Jt. Stip. at No. 105). From 1989 to 1997, I & M had no Comptroller, Accountant, Bookkeeper or Accounting Clerk.[8] (Loman Depo. at 93:16–94:20, Pace Decl. Exh. P).

DCAA understood that Parsons-affiliated companies would periodically subcontract with other Parsons-affiliated companies to perform work on a prime contract.[9] (Deposition of Dennis Umade, March 23, 2004 ("Umade Depo.") 51:20–52:3, Akro. Decl. Exh. AA). Parsons ES disclosed to

---

8. While Defendants do not dispute this aspect of Plaintiff's Uncontroverted Fact, the Court notes that the deposition testimony cited actually states that I & M did not have a *controller* rather than a *comptroller*. (Loman Depo. at 93:16–20, Pace Decl. Exh. P).

9. Plaintiff points out though that, as previously mentioned, the only intercompany subcontract ever made by Parsons ES was to I & M. (Jt. Stip. No. 113).

the DCAA that Parsons ES would account for subcontract costs as "other direct costs." (Deposition of Jonathan Yen, March 23, 2004 ("Yen Depo."), 22:8–12 & 23:1–4, Akro. Decl. Exh. CC). Plaintiff argues, however, that Parsons ES did not disclose that it would account for subcontract costs as "other direct costs" until the Parsons ES amended CASB Disclosure Statement dated May 27, 1994. (Kerestes Decl. at ¶ 7, Akro. Decl. Exh. F). Prior to that time, Senior DCAA auditor Michal Kerestes believed that subcontract costs were charged to Parsons ES' "direct costs accounts" and included in the Parsons ES direct labor base. (*Id.*). Parsons ES disclosed to the DCAA, and the DCAA understood, that "other direct costs" would not be included in the direct labor base that Parsons ES used to calculate the government's share of Parsons ES' indirect expenses. (Deposition of William E. Loesch, July 31, 2001, 96:26–97:11 ("Loesch Depo."), Akro. Decl. Exh. C).

The DCAA audits the indirect expense rate claims submitted by government contractors, and in connection with these audits, the DCAA tests, among other things, whether a contractor's allocation base is properly constituted. (Deposition of Mark Gill, August 1, 2001 ("Gill Depo."), 23:20–24:6, Akro. Decl. Exh. D; Yen Depo. at 50:15–51:8; Deposition of Donna Haupt, March 24, 2004 ("Haupt Depo."), 31:23–33:3, Akro. Decl. Exh. DD). In connection with its audits of indirect expense rate claims submitted by government contractors, the DCAA performs a series of "Minimum Annual Audit Requirements" ("MAARs"), which oblige the auditor to audit the propriety of the costs included and not included in the allocation base. (Gill Depo. at 26:15–22). In connection

with the audits of indirect expense rate claims submitted by government contractors, the DCAA prepares an Audit Report identifying any "questioned costs." (*Id.* at 31:3–32:8). If the DCAA does not identify any questioned costs, or if the contractor does not dispute any questioned costs that are identified, the indirect expense rate audited and determined by the DCAA becomes final. (*Id.* at 34:1–8). The DCAA and the contractor finalize the contractor's indirect expense rate by entering an agreement that sets "final indirect cost rates established by audit determination." (Akro. Decl. Exhs. K–S). The contractor uses the final indirect cost rates to determine the amount of indirect costs that should be billed to each government contract by multiplying the final rate by the labor costs incurred on the contract for that year; the product is the amount of indirect cost allocated to the contract. (*Id.*).

The DCAA performs regular audits to determine whether the contractor's accounting practices comply with CAS. (Deposition of Mark D. Gill, April 2, 2004 ("Gill Depo. II"), 104:3–19, Akro. Decl. Exh. EE). At least every three years, the DCAA must perform an audit to determine whether a contractor has complied with CAS 418. (Deposition of William E. Loesch, March 30, 2004 ("Loesch Depo. II"), 54:12–24, Akro. Decl. Exh. FF; Haupt Depo. at 94:14–95:25). However, for the period from 1988 to 1997, DCAA conducted only one CAS 418 Compliance Audit Report of Parsons ES, dated June 29, 1998.[10] (Report on Audit of Compliance with Cost Accounting Standard No. 418, June 29, 1998 ("CAS 418 Audit Report"), Akro. Decl. Exh. HH; July 6, 2004

---

10. Plaintiff notes that this Audit was conducted after the termination of the I & M subcontract in 1997 and that the I & M subcontract was never audited. Defendants state in their papers that performance of the BAR Contract ceased on December 31, 1997. (Deposition of Phillip James Morris, March 25, 1997 ("Defendants' Morris Depo."), Akro. Decl. Exh. G).

Letter of Edward L. Osuna to Joseph N. Akrotirianakis ("Osuna Letter"), Akro. Decl. Exh. RR). If the DCAA at any time finds a contractor is not complying with any provision of the CAS, then it must report that noncompliance and issue a notice of noncompliance to the contractor. (DCAA Contract Audit Manual §§ 8–302.7.a, c(1), Akro. Decl. Exh. GG, 689–90). The DCAA has never found Parsons ES' accounting practices to violate CAS 418. (Gill Depo. II at 49:10–16). The DCAA audited Parsons ES' compliance with CAS 418 and issued an audit report on June 29, 1998 concluding that Parsons ES' accounting practices complied with CAS 418. (*See* CAS 418 Audit Report, Akro. Decl. Exh. HH).

The specific accounting practice Plaintiff challenges was the subject of a 1994 meeting between representatives of the DCAA (including DCAA Branch Manager Masaro Nobuto, DCAA Supervisory Auditor Michal Kerestes, and DCAA Auditor Julia Watrous) and representatives of Parsons (including then-Parsons ES Controller Robert W. Jones, The Parsons Corporation Chief Financial Officer Curtis Bower, and Manager of Government Accounting Dan Schiff), during which the meeting participants reviewed Parsons' disclosed accounting practices related to intercompany transfers of labor costs by both intercompany work authorization and subcontract. (Deposition of Dan Schiff, Volume II, June 9, 2004 ("Schiff Depo. II"), 21:23–22:19; 24:6–25:13; 29:2–30:8, Akro. Decl. Exh.

OO). As a result of the 1994 meeting, the DCAA confirmed its understanding of Parsons ES' accounting practices for intercompany labor transfers and its acceptance of those practices. (*Id.* at 22:23–23:12, 24:6–25:13; 1994 Loesch Letter, Akro. Decl. Exh. KK; Akro. Decl. Exh. U at 494). While Plaintiff does not dispute these facts, she contends that the existence of the I & M intercompany subcontract transfers was being covered up at and after this meeting. (Schiff Depo. II at 22:14–19).

The DCAA has determined that the same language that Plaintiff challenges in the May 27, 1994 Disclosure Statement adequately described Parsons ES' accounting practices. (1994 Loesch Letter, Akro. Decl. Exh. KK).[11] Notwithstanding Plaintiff's allegations that Parsons ES' Disclosure Statements contain misrepresentations, the DCAA has approved Parsons ES' indirect expense claims for the years during which the challenged Disclosure Statements were effective, and determined that the language that Plaintiff challenges adequately states Parsons ES' accounting practices. (DCAA Audit Reports, Akro. Decl. Exhs. J–S; Peake Letter, Akro. Decl. Exh. JJ; 1994 Loesch Letter, Akro. Decl. Exh. KK; 1998 Loesch Letter, Akro. Decl. Exh. LL). While Plaintiff does not directly dispute this fact, she points to evidence that the ACO determination on adequacy contains caveats both in the letters cited by Defendants[12] and in the Ad-

---

11. While Plaintiff does not cite any evidence to dispute this fact, she points to this Court's 2001 Summary Judgment Order and the Ninth Circuit's decision in *Oliver* for the proposition that the ACO was deceived by the false certification of the May 27, 1994 Parsons ES Disclosure Statement.

12. The letters from the Administrative Contracting Officers Peake and Loesch, cited by Defendants, state that "[y]ou are further noti-

fied, however, that a disclosed practice shall not by virtue of such disclosure, be deemed to be proper, approved, or agreed to practice for pricing proposals or accumulating and reporting contract performance cost data." (Akro. Decl. Exhs. JJ, KK, & LL). The Loesch letters further state that "[a]dditionally, this document shall not be interpreted as agreement on the issue of compliance." (Akro. Decl. Exhs. KK & LL).

denda pertaining to litigation.[13] (Declaration of Dean Francis Pace in Opposition to Defendants' Motion for Summary Judgment ("Pace Opp. Decl.") Exhs. T–V).

The "including but not limited to" and "at cost" language to which Plaintiff objects appeared only in Parsons ES' Disclosure Statements and not in Parsons ES' indirect expense rate claims, proposals, or invoices. (Akro. Decl. Exhs. W–Z).

### B. *Procedural Summary*

This case was initially filed more than eleven years ago and, therefore, has an extensive procedural history. For the sake of brevity, this Court will simply include the most important and/or relevant aspects of that history in this summary:

On August 14, 1995, Plaintiff and Relator Janet C. Oliver filed her Complaint, and the action was assigned to Judge Gadbois.

On February 5, 1996, the case was transferred to Judge Byrne.

On November 1, 1996, the United States Government filed a Notice of Election to Decline Intervention.

On November 27, 1996, Defendants filed their Answer.

On May 5, 1997, Defendants filed a Motion for Summary Judgment, which Judge Byrne granted on July 31, 1997.

On May 6, 1997, Plaintiff filed a Motion for Summary Judgment, which Judge Byrne denied on July 31, 1997.

On September 16, 1997, Plaintiff filed a Notice of Appeal of Judge Byrne's Order Granting Defendants' Motion for Summary Judgment.

On July 20, 2000, the Ninth Circuit Court of Appeals' Mandate Reversing and Remanding the District Court's Grant of Summary Judgment to Defendants was filed and spread upon the minutes of the United States District Court.

On August 14, 2000, Defendants filed a Motion for Summary Judgment, which Judge Byrne denied on March 2, 2001.

On March 30, 2001, Defendants filed a Demand for a Jury Trial.

On July 27, 2001, Plaintiff filed a Waiver of Trial by Jury.

On August 1, 2001, Defendants filed a Notice of Waiver of Trial by Jury.

On August 22, 2003, Plaintiff filed her First Amended Complaint.

On September 16, 2003, Defendants filed their Answer to Plaintiff's First Amended Complaint.

On December 29, 2003, Defendants filed a Motion for Partial Summary Judgment, which this Court ordered off calendar on September 21, 2004.

On December 30, 2003, Plaintiff filed a Motion for Summary Judgment, which this Court ordered off calendar on September 21, 2004.

---

**13.** The Addenda to which Plaintiff refers state as follows:

> The CONTRACTOR and the Government acknowledge that certain indirect costs which are the subject of pending False Claims Act litigation have been included in the indirect expense claims covered by this agreement. The ACO has made no final determination as to the allowability or allocability of those costs that are the subject of litigation (the "Litigated

Costs"). In order to facilitate the negotiation and settlement of overhead claims for fiscal year 1995 [Plaintiff submits the addenda for fiscal years 1994 through 1999], and the attendant closure of contracts, these Litigated Costs have been provisionally allowed ....

(Pace Opp. Decl. Exh. V, Declaration of William E. Loesch ("Loesch Decl.") attached thereto).

On April 21, 2004, the United States of America filed an Amicus Curiae Memorandum in Opposition to Defendants' Motion for Summary Judgment.

On June 28, 2004, Defendants filed a Motion for Summary Judgment, which this Court ordered off calendar on July 28, 2004.

On June 28, 2004, Plaintiff filed a Waiver of Trial by Jury and Request for Trial by the Court.

On October 25, 2004, Defendants filed a Motion for Summary Judgment. On June 28, 2006, Defendants filed a Supplemental Brief in support of their Motion for Summary Judgment. The original Motion and the Supplemental Brief are currently before this Court.

On October 26, 2004, Plaintiff filed a Motion for Summary Judgment. On March 4, 2005, Plaintiff filed a Supplemental Memorandum regarding her Motion for Summary Judgment. On June 28, 2006, Plaintiff filed a Supplemental Brief regarding Cross–Motions for Summary Judgment. The original Motion, the Supplemental Memorandum, and the Supplemental Brief are currently before this Court.

On January 24, 2006, subsequent to the demise of Judge Byrne, a Notice of Reassignment of Case was issued transferring the case to this Court (Judge Tevrizian) for all further proceedings.

## II. *Discussion*

### A. *Standard on Motion for Summary Judgment*

Under the Federal Rules of Civil Procedure 56(c), summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *See id.;* Fed.R.Civ.P. 56(e).

A non-moving party who bears the burden of proof at trial to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. The non-movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders her claim implausible. *See Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, mere disagreement of the bald assertion that a genuine issue of material fact exists, no longer precludes the use of summary judgment. *See Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989); *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988).

If the moving party seeks summary judgment on a claim or defense on which it bears the burden of proof at trial, it must satisfy its burden by showing affirmative, admissible evidence. Unauthenticated documents cannot be considered on a

motion for summary judgment. *See Hal Roach Studios v. Richard Feiner and Co.,* 896 F.2d 1542, 1550 (9th Cir.1989); *Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir.1987). A document is authenticated when it is has the proper foundation. *Canada,* 831 F.2d at 925; *Hamilton v. Keystone Tankship Corp.,* 539 F.2d 684, 686 (9th Cir.1976); *United States v. Dibble,* 429 F.2d 598, 601–02 (9th Cir. 1970).

On a motion for summary judgment, admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. *See* Fed.R.Civ.P. 56(e). Declarations on "information and belief" are inappropriate to demonstrate a genuine issue of fact. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

## B. *Introduction*

■ The False Claims Act ("FCA") prohibits any person from knowingly presenting a false or fraudulent claim for payment or approval by the federal government. 31 U.S.C. § 3729(a)(1). It also prohibits anyone from knowingly making or using a false record or statement to get a false claim paid by the government. 31 U.S.C. § 3729(a)(2). Plaintiff contends that Parsons ES falsely certified its 1992 and 1994 Cost Accounting Standards Board ("CASB") Disclosure Statements in violation of section 3729(a)(2). She further contends that Parsons ES submitted numerous indirect expense rate claims, which constitute false claims under section 3729(a)(1), because they violated controlling federal regulations.[14] It should be

14. In the March 2, 2001 Order, this Court (Judge Byrne) explained the origin and role of the Cost Accounting Standards Board and the applicable regulations in detail:

"In 1988, Congress amended the Office of Federal Procurement Policy Act to reestablish the 'Cost Accounting Standards Board.' 41 U.S.C. § 422(a)(as amended by Federal Procurement Policy Act Amendments of 1988, Pub.L. 100–679, § 5(a), 102 Stat. 4056). The Board was granted exclusive authority to promulgate and rescind cost accounting standards, for the purpose of achieving 'uniformity and consistency in the cost accounting standards governing measurement, assignment, and allocation of costs to contracts with the United States.' 41 U.S.C. § 422(f)(1). With certain exceptions, Cost Accounting Standards promulgated under section 422 are 'mandatory for use by all executive agencies and by contractors and subcontractors in estimating, accumulating and reporting costs in connection with ... all negotiated prime contract and subcontract procurements with the United States in excess of $500,000.' " 41 U.S.C. § 422(f)(2)(A) (effective Nov. 17, 1988). The Office of Federal Procurement Policy Act as amended requires the Board to implement the mandatory CAS regime with rules and regulations. The Board is instructed to 'require contractors and subcontractors as a condition of contracting with the United States to—(A) disclose in writing their cost accounting practices, including methods of distinguishing direct costs from indirect costs and the basis used for allocating indirect costs.' 42 U.S.C. § 422(h)(1) (effective nov. 17, 1988). Thus, Congress in enacting subsection (h) incorporated CAS into FAR and made compliance with both a condition of contracting with the United States.

Pursuant to FAR, agency contracting officers have since 1992 been required to 'insert the provision at 52.230–1, Cost Accounting Standards Notices and Certification, in solicitations for proposed contracts subject to CAS as specified in 48 CFR 9903.201 (FAR appendix).' 48 C.F.R. § 30.201–3 (1997); *see also* 48 C.F.R. § 30.201–3 (1992), 57 Fed.Reg. 39587 (Aug. 31, 1992). In response, bidders on federal contracts (referred to as 'offerors') must examine section 52.230–1 and 'provide the requested information in order to determine [CAS] requirements applicable to any resultant contract.' 48 C.F.R. § 52.230–1 (1997); *see also* 48 C.F.R. § 52.230–1 (1992). Section 52.230–1 of FAR, entitled 'Cost Accounting Standards Notices and Certification,' provides, in pertinent part, that:

I. Disclosure Statement–Cost Accounting Practices and Certification

noted that Plaintiff does an extremely poor job of laying out the legal theories or alternative theories upon which each of her claims is based. However, Plaintiff repeatedly mentions the words "false certification" and "noncompliance." Therefore, it appears that Plaintiff claims FCA liability under section 3729(a)(1) as a result of Parsons ES' alleged false certification of compliance with federal law. This Court interprets Plaintiff's argument in that regard as being that Parsons ES falsely certified compliance with the requirement that it make a complete and accurate disclosure in its certified CASB Disclosure Statements, a prerequisite to entering into an agreement with the Federal government. To make out a prima facie case for violation of the FCA, Plaintiff must show that: "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) that the defendant knew the claim was false or fraudulent." *Oliver*, 195 F.3d at 461.

The parties agree that Parsons ES made claims against the United States. *Id.*

(a) Any contract in excess of $500,000 resulting from this solicitation, [subject to certain exceptions not asserted here], will be subject to the requirements of the Cost Accounting Standards Board (48 CFR Chapter 99) ...
(b) Any offeror submitting a proposal which, if accepted, will result in a contract subject to the requirements of 48 CFR Chapter 99 must, as a condition of contracting, submit a Disclosure Statement as required by 48 CFR 9903.202.
48 C.F.R. § 52.230–1(a) & (b) (1997); *see also* 48 C.F.R. § 52.230–1(a) & (b) (1992). 'Disclosure must be on a Form No. CASB DS–1 or CASB DS–2, as applicable. Forms may be obtained ... from the loose-leaf version of the Federal Acquisition Regulation.' 48 C.F.R. § 52.230–1(c)(1) (1997); *see also* 48 C.F.R. § 52.230–1(c)(1) (1992). As part of the submission if its Disclosure Statement, an offeror must 'certif[y] that the practices used in estimating costs in pricing this proposal are consistent with the cost accounting practices

Thus, the parties' cross-motions for summary judgment hinge on the elements of falsity and scienter.

### C. *Plaintiff's Motion for Summary Judgment*

#### 1. *Falsity*

Plaintiff contends that she is entitled to summary judgment as to the falsity of Parsons ES' 1992 and 1994 CASB Disclosure Statements as well as each of the indirect expense rate claims submitted to the government between 1989 and 1997.

##### a. Parsons ES' Failure to List I & M on its Disclosure Statement

 As required by the Disclosure Regulation (48 C.F.R. 9903.202) of the Cost Accounting Standards Board under Public Law 100–679, Parsons ES certified (through it's controller at the time, M.K. Holdsworth) in its 1992 and 1994 CASB Disclosure Statements that: "to the best of my knowledge and belief this Statement is the complete and accurate disclosure as of the above date by my above-named organization of its cost accounting prac-

disclosed in the Disclosure Statement.' 48 C.F.R. § 52.230–1(c)(1) (1997) (certification of concurrently submitted Disclosure Statement); *see also* 48 C.F.R. § 52.230–1(c)(2) (1997) (certification of previously submitted Disclosure Statement); 48 C.F.R. § 52.230–1(c)(1)–(2) (1992).
Likewise, Chapter 99 of the Federal Acquisition Regulations System, promulgated under section 422(h) of the amended Office of Federal Procurement Policy Act, provides that the 'data which are required to be disclosed' by an offeror 'are set forth in detail in the Disclosure Statement Form, CASB–DS–1.' 48 C.F.R. § 9903.202–9 (1997); *see also* 48 C.F.R. § 9903.202–9 (1992). As the Ninth Circuit pointed out and as Defendants stipulate, offerors must include within their Disclosure Statement a mandatory paragraph on "Interorganizational transfers." *See Oliver*, 195 F.3d at 465; *see also* Jt. Stip. No. 25, Pace Decl. Exh. B. (2001 Summ. Judg. Ord. at 7:6–8:27).

tices ...." (Akro. Decl. Exhs. T & U). Plaintiff alleges that this certification on the Disclosure Statements was false, because, although required to make a "complete and accurate" disclosure, Parsons ES did not include I & M among the list of companies with which it had inter-organizational transfers in § 2.8.0 Inter-organizational Transfers. (Jt. Stip. No. 26, Pace Decl. Exh. B). Thus, Plaintiff contends that Parsons ES violated the False Claims Act, because a truthful certification was, under the Federal Acquisition Regulations, a prerequisite to entering into a contract with the United States Government. *See* 48 C.F.R. § 52.230–1 ("Any offeror submitting a proposal which, if accepted, will result in a contract subject to the requirements of 48 C.F.R. Chapter 99 must, as a condition of contracting, submit a Disclosure Statement as required by 48 C.F.R. 9903.202."); *see also* 48 C.F.R. § 30.202–6(b) ("The contracting officer shall not award a CAS-covered contract until the cognizant Federal agency official (CFAO) has made a written determination that a required Disclosure Statement is adequate ...."). Plaintiff further argues that both the Ninth Circuit and the United States District Court (Judge Byrne) have already ruled that Parsons ES was required to provide an exhaustive list of all of the organizations with which it had inter-organizational transfers, but did not do so, and that, therefore, the omission of I & M from section 2.8.0 rendered the Disclosure Statements false as a matter of law. (No-

tice of Motion and Motion for Summary Judgment by Plaintiff ("Pl. Mot."), 7:3–8:26).

In response, Defendants first argue that Plaintiff has not established that Parsons ES was required to list by name each of the entities with which it had inter-organizational transfers. Defendants claim that there was, in fact, no such requirement, because section 2.8.0 addresses *transfers* "from divisions, subsidiaries, or affiliates under common control" and the *"basis"* Parsons ES used "as transferee to charge the cost or price" rather than asking for identification of each of the "divisions, subsidiaries, or affiliates under common control" that transferred materials, services, or labor to Parsons ES. In making this argument, Defendants note that they disagree with Plaintiff's "characterizations of this Court's March 2, 2001 ruling as a determination that 'Parsons ES was required to list I & M in its section 2.8.0 disclosure.'" (Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp."), p. 6, n. 4). Defendants further note that, even if the Court had so ruled, such ruling would not be the law of the case. (*Id.*) Second, Defendants contend that the CASB Disclosure Statements were not "false or fraudulent" because, on its 1992 statement, Parsons ES included "etc." after the list of companies,[15] and, on its 1994 statement, Parsons ES stated the companies with which it had transfers "include[d] but [was] not limited to" those companies listed.[16] Thus, Parsons ES gra-

---

**15.** In its 1992 CASB Disclosure Statement, Parsons ES states as follows in section 2.8.0 Inter-organizational Transfers:

> Those company organizations outside this reporting unit (i.e. The Ralph M. Parsons Company, Inc. [sic] Chas T. Main, Inc., etc.) under common control by the Parsons Corporation are issued inter-company work authorizations for their services, materials and supplies at full cost including a markup for fringe benefits (payroll burden).

(Akro. Decl. Exh. T at 446).

**16.** In its 1994 CASB Disclosure Statement, Parsons ES states as follows in section 2.8.0 Inter-organizational Transfers:

> Those company organizations outside this reporting unit which include but not limited to De Leuw Cather Company, Inc.; Parsons Environmental Services, Inc.; Parsons Main, Inc.; Parsons SIP, Inc.; The Ralph M. Parsons Company; Steinman

tuitously included an expressly and obviously non-exhaustive list of examples of organizations outside the reporting unit rather than an exhaustive list of those organizations. Finally, Defendants argue that the Government was not misled by the non-inclusion of I & M.[17]

Section 2.8.0 of the 1992 and 1994 CASB Disclosure Statements states:

Inter-organizational Transfers.

This item is directed only to those materials, supplies, and services which are, or will be transferred to you from divisions, subsidiaries, or affiliates under common control with you. ( [I]ndicate the basis used by you as transferee to charge the cost of materials, supplies, and services to Government contracts of similar cost objectives.)

(Akro. Decl. Exh. T at 424; Akro. Decl. Exh. U at 464). As Plaintiff states in her Motion for Summary Judgment, the Ninth Circuit previously found that, in response to section 2.8.0, "Parsons ES submitted a list of companies it stated 'included' but was not 'limited to' the companies with which it had interorganizational transfers. Parsons ES did not list I & M among these companies, despite the fact that it was required to provide a 'complete and accurate' disclosure under the regulations." *Oliver*, 195 F.3d at 465. Judge Byrne later found, in denying Defendants' Motion for Summary Judgment, that the Ninth Circuit "held that Parsons ES was required to list I & M in its section 2.8.0 disclosure, despite [the District Court's]

Boynton Gronquist & Birdsall; Barton–Aschman Associates, Inc.; Harland Bartholomew & Associates, Inc.; Parsons Construction Services, Inc.; Parsons Development Company; Parsons Constructors, Inc.; The Ralph M. Parsons Company Limited, all of which are under common control of The Parsons Corporation are issued inter-company work authorizations for their services, materials and supplies.

earlier finding that I & M was a segment and therefore properly accounted for by Parsons ES." (2001 Summ. Judg. Ord. at p. 6, n. 1). In light of these findings, Plaintiff asks this Court to hold that Parsons ES' 1992 and 1994 CASB Disclosure Statements were "false or fraudulent" due to the failure to list I & M as a company with which it had inter-organizational transfers. While Defendants make numerous arguments that Parsons ES' failure to list I & M does not make the Disclosure Statements "false or fraudulent," they barely address these prior findings. Rather, in their Opposition to Plaintiff's Motion for Summary Judgment, Defendants simply state *in a footnote* that:

Parsons does not agree with plaintiff's characterizations of this Court's March 2, 2001 ruling as a determination that 'Parsons ES was required to list I & M in its section 2.8.0 disclosure.' Mot. at 7:18–19. Even if the Court had so ruled, neither the law of the case doctrine nor any other legal principle would preclude the Court from reconsidering that ruling in light of the evidence and argument in Parsons' October 25, 2004 Motion and this Opposition.

(Def. Opp. at p. 6, n. 4). Similarly, in their Motion for Summary Judgment, Defendants' contend that "[n]o prior ruling forecloses this Motion for Summary Judgment," and go on to state in a footnote that:

(Akro. Decl. Exh. U at 494).

17. Defendants cite to their Motion for Summary Judgment for additional arguments. However, consideration of those arguments is not necessary for this Court to reach a decision on Plaintiff's Motion for Summary Judgment. Therefore, such arguments will be discussed in the portion of this Order addressing Defendants' Motion for Summary Judgment.

The issues raised in Parsons' Motion were also not decided by this Court, in its March 2, 2001 Order denying Parsons' August 12, 2000 Motion for Summary Judgment. In its August 12, 2000 Motion, Parsons argued that not listing I & M among the companies with which Parsons ES had inter-organizational transfers was not 'false' within the meaning of the False Claims Act. This Court denied Parsons' Motion on the ground that plaintiff had raised a genuine issue of fact as to whether representations in Parsons ES' Disclosure Statement were 'false.'

(Defendants' Motion for Summary Judgment ("Def. Mot."), 11:5 and n. 44).

Defendants' contention that Judge Byrne held in the previous order that Plaintiff had raised genuine issues of fact as to whether Parsons ES was required to include I & M in its section 2.8.0 disclosure is incorrect.[18] In fact, the Byrne Court stated that "any failure of defendants to make required disclosures regarding the relationship between Parsons ES and I & M would render their certification of compliance with FAR and CAS "false or fraudulent" within the meaning of the False Claims Act." This, coupled with Judge Byrne's clear interpretation of the Ninth Circuit's language as holding that Parsons ES was required to list I & M in its section 2.8.0 disclosure, supports Plaintiff's position.

Based on these findings, this Court must consider Defendants' argument that "neither the law of the case doctrine nor any other legal principle would preclude the Court from reconsidering [the Byrne Court's] ruling in light of the evidence and argument in Parsons' October 25, 2004 Motion and this Opposition." (Def. Opp. at p. 6, n. 4). Defendants and Plaintiff correctly agree that a denial of summary judgment is not the law of the case. *See Sport Squeeze, Inc. v. Pro–Innovative Concepts, Inc.,* 1999 WL 395328, at * 7 (S.D.Cal.). Defendants, therefore, are correct that this Court may, if it so chooses, reconsider Judge Byrne's ruling. While this Court "may reconsider and reverse a previous interlocutory decision for any reason it deems sufficient," "a court should generally leave a previous decision undisturbed absent a showing that it either represented clear error or would work a manifest injustice." *Abada v. Charles Schwab & Co., Inc.,* 127 F.Supp.2d 1101, 1102–03 (S.D.Cal.2000) (citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988)). Defendants have made no such showing. Their arguments as to why the failure to disclose I & M does not render Parsons ES' Disclosure Statements false are repetitive of their arguments in the prior motion for summary judgment, and Defendants admit that there is no new evidence in the current Motions.[19] Defendants do not argue

---

**18.** The Byrne Court's statements that Plaintiff had raised a genuine issue of fact referred to (1) the certification of intercompany transfers as "at cost"; and (2) Defendants' contention that "the government was not damaged by any omission." (2001 Summ. Judg. Ord. at 10:18–11:10). No such statement was made in regards to whether Parsons ES was required to list I & M in its section 2.8.0 disclosure. In fact, in addition to the language quoted earlier, (*see supra* at 27:10–20), Judge Byrne's Order states as follows: "Defendants

have two arguments in response to this holding of the Ninth Circuit. The first is that no federal regulation required Parsons ES to list the I & M subcontract on its Disclosure Statement. This contention, however, has been squarely rejected by the Ninth Circuit." (2001 Summ. Judg. Ord. at 9:9–12).

**19.** Each of Defendants' current arguments was also made in their prior motion for summary judgment: (1) that Parsons ES was not required to list the organizations with which

or present evidence that the Ninth Circuit got it wrong, or that Judge Byrne incorrectly interpreted the Ninth Circuit's findings (they simply argue that Plaintiff "mischaracterized" Judge Byrne's ruling but do not attempt to explain how or set forth the accurate characterization). Furthermore, Defendants did not in the past and do not now introduce testimony that, as a general practice, responses to section 2.8.0 do not include a listing of the relevant entities. The testimony they point to simply states that the Disclosure Statements address accounting and that certain individuals knew the list of entities was not complete. If a listing of entities is not required, it should be fairly easy to introduce such testimony. While, under normal circumstances, the burden would be on Plaintiff to show that the complete list was required, the Ninth Circuit and Judge Byrne have already ruled that Plaintiff met that burden. Therefore, it is now Defendants' responsibility to provide this Court with a compelling reason to reconsider Judge Byrne's finding. Defendants have provided this Court with no such compelling reason. As a result, summary judgment is warranted in Plaintiff's favor on the narrow issue that the failure of Parsons ES to list I & M in its section 2.8.0 disclosure rendered the 1992 and 1994 Disclosure Statements "false." [20]

### b. Parsons ES' Characterization of Transfers Between I & M and Parsons ES as "At Cost"

■ Plaintiff also contends that the 1992 and 1994 certified CASB Disclosure Statements are false as a matter of law, because Parsons ES certified that subcontracts between Parsons ES and other subsidiaries of TPC would be "at cost." Defendants have stipulated that: (1) the Disclosure Statements provide that Inter-organizational transfers treated as sub-

---

it had inter-organizational transfers because section 2.8.0 addresses only *methodologies* and *practices* of transfers and does not ask for a list of such transfers. (Def. Opp. at 6:11–7:12; Defendants' Notice of Motion and Motion for Summary Judgment dated August 14, 2000 ("Aug.2000 Mot."), 3:3–10, 4:17–18, 9:11–12); and (2) that Parsons ES' section 2.8.0 response was literally accurate (and, therefore, not false) based on the inclusion of the language "include but not limited to" and "etc." (Def. Opp. at 8:15–9:3; Aug.2000 Mot. at 3:11–16, 8:8–9:11).

Defendants' final argument that the Government was not misled by the non-inclusion of I & M does not impact whether the statement was, nevertheless, false. Rather, if true, this factor would go towards the materiality of the statement or damages. Thus, this argument will be discussed later in section II.D.3 of this Order.

**20.** To the extent that Plaintiff bases her claim on 31 U.S.C. § 3729(a)(2), it should be noted that there is a "double falsehood" requirement. *See United States ex rel. Franklin v. Parke–Davis*, 2003 WL 22048255, *1 (D.Mass. Aug. 22, 2003); *see also United States ex rel. Bustamante v. United Way/Crusade of Mercy, Inc.*, 2000 WL 690250, *4 (N.D.Ill. May 24, 2000) (holding that the "elements of a claim under § 3729(a)(2) are: (1) that the defendant made, used, or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement *and* the claim were false or fraudulent; and (3) the defendant knew that the record or statement *and* the claim were false or fraudulent." (emphasis added)). Thus, in addition to the elements of a prima facie case for violation of 31 U.S.C. § 3729(a)(1) (the knowing submission of a claim that is false or fraudulent), Plaintiff must also prove that Parsons ES made a *false statement* that caused the payment or approval of a false claim. The Court's ruling here, consistent with Judge Byrne's prior ruling, is simply that Plaintiff is entitled to partial summary judgment on the falsity of *the underlying statement*, the 1992 and 1994 Disclosure Statements, due to Parsons ES' failure to include I & M in its section 2.8.0 response. The Court will address whether Plaintiff has satisfied its burden on the second falsity requirement—the falsity of the claims—in Part II. C.1.c of this Order.

contracts are "at cost." (Jt. Stip. Nos. 25 & 48, Pace Decl. Exh. B); and (2) Parsons ES entered into a subcontract with I & M to assist in the implementation of the BAR Contract. (*Id.* at Nos. 99, 100, & 113). Defendants further stipulate that, in actuality, I & M invoices to Parsons ES on the BAR Contract were at direct labor plus a multiplier. (*Id.* at No. 49). That multiplier included profit. (Interrog. No. 199, Pace Decl. Exh. J. at 12). Thus, Plaintiff contends that Parsons ES did not comply with its Disclosure Statements, because it mis-characterized the intercompany transfers between I & M and Parsons ES as "at cost," rather than disclosing that they contained a cost multiplier.

In response to Plaintiff's contentions, Defendants argue that the "at cost" language does not, as Plaintiff suggests, apply to the costs of I & M—the billing company. Rather, it applies to the costs of Parsons ES—the company that made the disclosure. Thus, the "at cost" language indicates that when Parsons ES received an invoice from I & M, Parsons ES would charge the amount or "cost" of that I & M invoice to its "other direct cost" account and would not add its own markup to the amount I & M charged. Defendants claim that this is the only reasonable interpretation of the statement and provide testimony of Parsons ES' former controller to that effect. (Jones Depo. at 30:21–32:7, Supp. Akro. Decl. Exh. C).

The language at issue in section 2.8.0 of the Disclosure Statements is as follows: "If contractual arrangements provide that these costs be treated as intercompany subcontracts*, the costs billed by the affili-

ated companies are charged to the other direct cost accounts" and " *Intercompany transfers at cost." [21] (Pace Decl. Exh. C). Plaintiff believes that the relevant issue is whether the transfers from I & M to Parsons ES were "at cost." Defendant, on the other hand, believes that the relevant issue is whether Parsons ES recorded the "cost" as it was invoiced by I & M without marking it up. Neither party presents an argument that their interpretation is the only *legally* correct interpretation of the language at issue. Expert testimony may be necessary to interpret the clause at issue and neither party has provided such testimony. Therefore, Plaintiff is not entitled to summary judgment on this issue, because there is a genuine issue of material fact as to whether the "at cost" language refers to Parsons ES' cost or I & M's cost.

### c. Whether Parsons ES' Accounting Practices Violate the Governing Federal Regulations

Plaintiff contends that Parsons ES' practice of excluding I & M's labor costs from its direct labor base does not comply with the Cost Accounting Standards (the controlling federal regulations). Thus, Plaintiff argues that the 4,056 indirect expense rate claims (1,314 cost reimbursement vouchers, 2,126 progress payment invoices, and 616 certifications of costs) that Parsons ES submitted to the DCAA between 1989 and 1997 all constitute false claims under section 3729(a)(1) of the FCA, because each of those claims was calculated using an allegedly fraudulent accounting practice. This is the central dispute of this case, because in order to prevail on any of her theories/claims, Plaintiff must prove that the indirect ex-

---

**21.** The quoted language is taken from Parsons ES' 1994 certified CASB Disclosure Statement. However, the language in the 1992 Disclosure Statement is similar. Specifically, it provides as follows: "If contractual ar-

rangements provide that these costs be treated as subcontract costs, the costs billed by the affiliated companies are charged to the direct cost accounts at cost." (Akro. Decl. Exh. T at 446).

pense claims were false in that they violated the controlling federal regulations and/or the accounting practices disclosed.

The alleged violation is that the overhead costs of the support and service functions and activities caused by I & M or for the benefit of I & M have been incurred by other Parsons segments, including Parsons ES, without transfer to I & M. The undisputed facts show that Parsons ES incurred a number of costs for the benefit of I & M including, but not limited to: rent, office equipment, license and fees, reproduction costs, office supplies, communication/telephone, utilities, training and development, freight and postage, etc. It is also undisputed that Parsons ES labor for overhead functions, activities, and expenses was never transferred to I & M. Plaintiff claims that this violated CAS 410, 418, and 420 as well as the certified CASB Disclosure Statements.

### (1) Cost Accounting Standards 410, 418, and 420

Plaintiff does not provide the language of the Cost Accounting Standards at issue and, instead, relies solely on the statements of her expert witness, Lane K. Anderson Ph.D., CMA, CPA ("Anderson"). In regards to these Cost Accounting Standards, Anderson simply states as follows:

> Business units that do not perform all of the support and service functions themselves will have other segments and business units in the overall corporate entity perform these functions. Cost Accounting Standards 410, 418, and 420 make clear that such costs must be transferred back to the benefitting business unit to be included with the costs it will allocate to final cost objectives.

(Supplemental Updated Expert Witness Report of Lane K. Anderson, Ph.D., CMA, CPA, dated May 14, 2004 ("Anderson Supp. Rep."), p. 1–2, Pace Decl. Exh. Q). In his supplemental report, Anderson

states that "the scope of [his] opinion relates to the accounting requirements from the Federal Acquisition Regulations (FAR) and the Cost Accounting Standards (CAS) as they bear on The Parsons Company's cost allocations to government contracts" with particular reference to Parsons ES, I & M, and RMP. (*Id.* at 1). Anderson further states that "Cost Accounting Standards and the Federal Acquisition Regulations work on the basis of full costing" and that "[w]hen a business unit transfers a final cost objective—a product or service—to another business unit, the full costs of the transferring business unit should already be attached to the products or services transferred." (*Id.* at 2). With respect to I & M, Anderson opined as follows:

> [I & M] had support and service costs incurred by other segments such as Parsons ES .... These support and service costs should have been excluded from the costs of other segments and moved to I & M. Once the support and service costs were accumulated in I & M for the appropriate cost accounting period, the costs should have been allocated to the final cost objectives of I & M. Had this occurred, the overhead costs of other segments, such as Parsons ES ..., would not have been overstated by the amounts of costs incurred for and on behalf of I & M and not moved to I & M .... [Because Parsons ES] did not move to I & M the support and service costs they incurred for and on behalf of I & M ... the federal government contracts of Parsons ES were charged higher amounts of overhead costs. Since I & M labor costs were transferred to Parsons ES for purposes of charging labor costs to the BAR contract, including those labor costs in the overhead allocation base would have achieved the equivalent effect to removing the I & M

support and service costs from the overhead costs and moving them to I & M. (*Id.* at 2–3). Thus, based entirely on these statements, Plaintiff contends that, if I & M is a segment as both the Ninth Circuit and this Court have found, I & M should have complied with these CAS and FAR.

While Plaintiff has clearly provided enough evidence to create a genuine issue of material fact, she has not met her burden on summary judgment of demonstrating that no genuine issue of material fact exists as to whether Parsons ES' accounting practices violated CAS 410, 418, or 420. Plaintiff has provided no textual analysis of the CAS at issue and has not even cited the exact CAS sections violated by these practices. Furthermore, even if Plaintiff had met her burden, Defendants have set forth enough evidence to create a triable issue of fact. Specifically, Defendants present expert testimony stating, among other things, that "[b]ased upon my review, it is my opinion that the accounting practices employed by the defendants were fully compliant with all relevant U.S. Government contracting rules, regulations and laws." (September 1, 2004 Report of Louis P. Goldman ("Goldman Rep."), p. 5, Supp. Akro. Decl. Exh. K). Additionally, Defendants' expert, Louis P. Goldman, challenges Anderson's factual statements and analysis of Parsons ES' accounting treatments. (*Id.* at ¶ 7, pp. 25–27). The Ninth Circuit has described the applicable regulations as "unquestionably technical and complex." *Oliver*, 195 F.3d at 463. While the Ninth Circuit went on to state that the meaning of the regulations "is ultimately the subject of judicial interpretation," the parties have not submitted sufficient evidence to allow the Court to make such an interpretation at this time. Further expert analysis is necessary to resolve this mixed question of law and fact. Accordingly, this Court finds that a genuine issue of material fact exists as to whether Parsons ES' accounting practices violated CAS 410, 418, and/or 420, and summary judgment is not warranted at this time.

### (2) Certified CASB Disclosure Statements

Plaintiff further argues that the Parsons ES accounting practices at issue do not comply with the following accounting practices disclosed in Parsons ES' certified CASB Disclosure Statement regarding the allocation of Overhead and G & A expenses to Intercompany Subcontract Transfers: "If contractual arrangements provide that these costs be treated as intercompany subcontract transfers of costs, the costs billed by the affiliated companies are charged to the other direct cost accounts. *Labor is burdened with applicable overhead, fringe and G & A expenses.*" (CASB Disclosure Statement dated December 29, 1995 ("1995 Discl. Stat."), p. 12, Pace Decl. Exh. R). Plaintiff states that, if this language is intended to mean that "the receiving [Parsons ES] applies the [Parsons ES] overhead to the I & M transferred subcontract labor, then the liability on the Qui Tam action is conclusive." (Pl. Mot. at 15:12–15). Plaintiff further argues that if, on the other hand, the "certified CASB Disclosure Statement means that the I & M labor costs must be burdened with the support and service costs caused by I & M or for the benefit of I & M, then there is a false noncompliance with the certified [Parsons ES] CASB Disclosure Statement" concerning subcontract intercompany transfers. (*Id.* at 15:15–21).

In support of these arguments, Plaintiff points to the following undisputed facts: (1) the Parsons ES labor incurred for support and service for the benefit of I & M was never transferred to I & M. (Jt. Stip. Nos. 30–43, Pace Decl. Exh. B; Loman Depo. Vol. II at 179:18–193:23); and (2) the I & M invoices to Parsons ES con-

tained only labor and a multiplier for profit and fringe benefits, and did not include overhead. (I & M Subcontract, p. 8, Pace Decl. Exh. H; Morris Depo. at 52:3–53:1, Pace Decl. Exh. K). Defendants argue that labor costs incurred by RMP were in fact billed to I & M. However, Defendants do not address the Parsons ES labor, which is at issue here or Plaintiff's contention regarding the language in the certified Disclosure Statement regarding allocation of overhead and general and administrative costs.

While Plaintiff does present some evidence that Parsons ES' accounting practices may not have complied with the cited language in the disclosure statement, genuine issues of fact still exist as to exactly how the language of the Disclosure Statement should be interpreted or, more importantly, whether there was a net dollar difference in the accounting utilized by Defendants and the accounting practice Plaintiff advocates should have been followed under the governing regulations. In fact, Plaintiff acknowledges the ambiguity when she sets forth separate arguments for two potential interpretations. Plaintiff provides no evidence to support the correct interpretation of the language. Additionally, this Court notes that the cited language is from a 1995 Disclosure Statement, and Plaintiff does not cite similar language in the 1992 and 1994 Disclosure Statements. As far as this Court can see, Plaintiff has made no reference to the 1995 Disclosure Statement in the operative complaint and makes no argument as to which of the allegedly false indirect expense claims this language applies. Accordingly, this Court finds that summary judgment on Plaintiff's claim that Parsons ES violated federal regulations by not complying with the language in its 1995 certified Disclosure Statement would be premature.

### 2. *Scienter*

"Knowledge [or scienter] is established by proving that the defendant (1) had actual knowledge that it submitted a false or fraudulent claim for payment or approval, (2) acted in deliberate ignorance of the truth or falsity of its claim, or (3) acted in reckless disregard of the truth or falsity of its false claim." *Oliver*, 195 F.3d at 464. Plaintiff asks this Court to grant summary judgment in her favor on the element of scienter.

In support of her argument, Plaintiff points to the following as evidence of Defendants' actual knowledge, deliberate ignorance, or reckless disregard: (1) the I & M subcontract was the only subcontract ever made by Parsons ES and I & M's only purpose was to perform labor on the BAR Contract; (2) Parsons ES' failure to list I & M in its certified CASB Disclosure Statements; (3) seven asterisks to the right of the listing of the Parsons ES Inter-organizational Transfers by name in the 1994 CASB Disclosure Statement, indicating revisions; (4) I & M's lack of overhead, because such overhead costs were incurred by Parsons ES and other TPC segments; (5) concealment of the I & M financial accounting; (6) that RMP/PIT had an accounts payable to I & M, when the only I & M invoices were issued to Parsons ES; and (7) that I & M invoiced Parsons ES for profit when the Disclosure Statements indicate that Intercompany Transfers on subcontracts are at cost. Although she does not specifically mention it when she addresses the element of scienter, Plaintiff has also submitted the affidavit of the relator. In her affidavit, Oliver states that: (1) when she learned of I & M's existence, she was told by the Parsons ES controller to "forget about it"; and (2) the Parsons ES BAR Contract manager told her that I & M was set up so that Parsons ES "would not have to include the

direct labor in the Parsons ES direct labor base for computation of the overhead rate which is invoiced on United States Government contracts." (Oliver Decl., 2:13–18; 3:7–11, Pace Decl. Exh. D).[22]

In 1999, the Ninth Circuit denied summary judgment for Defendants on the issue of scienter, because it found that Plaintiff had produced enough evidence to create a genuine issue of material fact. *Oliver*, 195 F.3d at 464–65. Defendants contend that, because Plaintiff has not introduced any new evidence, the Ninth Circuit holding is the law of the case, and Plaintiff is not entitled to summary judgment.

Defendants are correct that the Ninth Circuit, considering only Parsons' failure to disclose the existence of I & M in its disclosure statement and the Oliver affidavit, held that such "evidence [was] enough to create a genuine issue of material fact precluding summary judgment on the issue of scienter." *Id.* Regardless of the Ninth Circuit's ruling, viewing this same evidence in the light most favorable to Defendants, there are issues of fact that survive the standard of summary judgment. Defendants contend that Parsons ES was not required to list each and every entity with which it had interorganizational transfers because the CASB disclosure statement simply addressed accounting *practices* and *methodologies*.[23] The Ninth

Circuit held that the "reasonableness of Parsons' interpretation" of the regulations and accounting standards does not impact the determination of falsity; it also held that it "may be relevant to whether it knowingly submitted a false claim . . . ." *Oliver*, 195 F.3d at 463. Thus, viewing this evidence in the light most favorable to Defendants, it is possible that the omission of I & M from the 1992 and 1994 Disclosure Statements was a result of negligence or mistake and not the result of fraudulent scienter. As for the Oliver affidavit, the statement "forget about it" is inconclusive, and the statement of the Parsons ES executive as to why I & M was set up does not prove that such executive, or anyone else in the company, knew that such a practice violated the controlling regulations.

As to the challenged "at cost" language, Defendants produce testimony that it was intended to disclose to the government that Parsons ES would not add its own markup to the amount invoiced by I & M, which Parsons ES allegedly believed to be consistent with its disclosed practices.[24] The remainder of Plaintiff's evidence, much of which has been stipulated to, does not establish, beyond factual dispute, that Defendants acted with scienter. Therefore, summary judgment on the issue of scienter is not warranted at this time.

Plaintiff's Motion for Summary Judgment is **granted in part** and **denied in**

---

**22.** As the Ninth Circuit noted, the affidavit further states that:

I replied that Parsons better hope DCAA doesn't discover I & M. The reason why I said that was because I knew that the Defense Contract Audit Agency was upset what [sic] the DCAA Auditors discovered during a floorcheck in 1992 that Parsons ES was providing services (Accounting, Human Resources, etc.) to intercompanies ES2, ESDC, etc. Because of that discovery, DCAA asked Parsons ES to produce a list of all Parsons interorganizational companies for which Parsons ES performed

services. Parsons ES provided this list to DCAA. However, I & M was excluded on this list even though I & M has been transferring labor and fringe benefits intercompany to ES and Parsons ES since 1989. (Oliver Decl. at 2:18–3:1, Pace Decl. Exh. D).

**23.** Holdsworth Depo. at 22:6–13, Supp. Akro. Decl. Exh. D.

**24.** Deposition of Robert William Jones, March 31, 1997 ("Jones Depo."), 30:21–32:18, Supp. Akro. Decl. Exh. C.

part. Specifically, this Court grants Plaintiff summary judgment on the narrow issue of whether Parsons ES' failure to list I & M in section 2.8.0 of its 1992 and 1994 certified CASB Disclosure Statements rendered those Disclosure Statements false. Plaintiff's Motion for Summary Judgment is denied on all other grounds.

### D. *Defendants' Motion for Summary Judgment*

As previously discussed, the Ninth Circuit has held that there is "a genuine issue of material fact precluding summary judgment [for Defendants] on the issue of scienter." *Oliver*, 195 F.3d at 465. Thus, Defendants move this Court for summary judgment on the grounds that Plaintiff cannot establish "falsity" or "materiality," both essential elements of a claim under the FCA. Specifically, Defendants contend that: (1) Parsons ES' indirect expense rate claims are not "false" under the FCA, because the DCAA has accepted and approved Parsons ES' accounting practices; (2) Parsons ES' indirect expense rate claims are not false under the FCA because Parsons ES was entitled to the amounts of reimbursable indirect expenses it claimed; (3) Plaintiff cannot establish the element of materiality, because the DCAA has approved Parsons ES' claims; and (4) the undisputed evidence shows that the alleged misrepresentations in Parsons ES' Disclosure Statements are not "false" in any "material" way. Alternatively, Defendants request that this Court issue an order limiting Defendants' potential damages to civil penalties on the two allegedly false CASB Disclosure Statements.

1. *Whether DCAA Conclusively Determined That Parsons ES' Accounting Practices Complied With Federal Regulations*

■ Defendants argue that the DCAA approved Parsons ES' accounting practices, that the DCAA even audited Parsons ES' accounting practices, and that the DCAA never objected to those accounting practices. From this, Defendants draw the conclusion that the DCAA, therefore, *approved* Defendants' accounting practices and that this Court must defer to that determination. In support of their contention, Defendants focus primarily on: (1) the annual final indirect expense rate agreements for the years 1989 to 1997 entered into between the DCAA and Parsons ES; and (2) a 1998 audit by the DCAA specifically addressing CAS 418.

### a. Final Indirect Expense Rate Agreements

Defendants contend that the DCAA's "finalization" of its indirect expense rates constitutes approval of its indirect expense claims (since claims are based on the rates) and its accounting practices. They place particular weight on the agreements for the years 1991 to 1997, because those agreements were reached after Plaintiff filed this lawsuit, and thus the DCAA supposedly entered into those agreements with full knowledge of Plaintiff's allegations. Additionally, Defendants point out that the DCAA knew of the existence of I & M as early as 1994, prior to the date of finalization of the 1991 to 1997 indirect expense rate claims. (Jt. Stip. Nos. 110–111, Pace Decl. Exh. B). Defendants cite the testimony of DCAA supervisory auditor Mark Gill for the proposition that the DCAA ordinarily will not finalize a rate if the government believes there is a question as to whether it has been defrauded. (Gill Depo. at 101:16–102:2, Akro Decl. Exh. D). Gill's actual testimony, though, is that the Department of Justice will on occasion *notify* the DCAA that there is fraud involved and *direct them* not to proceed with their audit. He does not testify that the DCAA will make that decision on

its own. In the same vein, Defendants also introduce testimony that DCAA auditors are required to raise any cost accounting issues that come to their attention, (Deposition of Michal Jean Kerestes, November 20, 2001 ("Kerestes Depo."), 52:15–18, Akro. Decl. Exh. E), and note that the DCAA never identified any questioned cost or made any other determination that a Parsons ES indirect expense rate claim had been incorrectly calculated. (DCAA Audit Reports, Akro. Decl. Exhs. J–S).

While Defendants are correct that the rate agreements were finalized and that the DCAA never identified any questioned cost, the language in the indirect expense rate agreements does not indicate that the DCAA conclusively determined that Parsons ES' accounting practices *complied* with the applicable federal regulations. Instead, the agreements, using the following or similar language, state that: "Our audit did not find any exceptions to the contractor's proposed indirect rates." (Akro. Decl. Exh. N., p. 2). This is further confirmed by Addenda to those agreements, negotiated between Parsons ES and the DCAA in 2000, which expressly provide as follows:

> The ACO has made no final determination as to the allowability or allocability of [certain indirect] costs that are the subject of [pending False Claims Act] litigation (the 'Litigated Costs'). In order to facilitate the negotiation and settlement of overhead claims ..., these Litigated Costs have been provisionally allowed. However, the Government expressly reserves the right to make a final determination as to the allowability and allocability of the Litigated Costs at a later date ...

(Pace Opp. Decl. Exh. V, Loesch Decl. attached thereto Exhs. 1–7). The contents of these Addenda are reinforced by letters sent by William L. Loesch and Nancie Peake, DCAA Administrative Contracting Officers, to Parsons ES in response to Parsons ES' CASB Disclosure Statements. In the letters, Loesch and Peake state that "a disclosed practice shall not by virtue of such disclosure [ ] be deemed to be proper, approved, or agreed to ...." (Akro. Decl. Exhs. JJ, KK, & LL). Loesch further states that "[t]his [letter] shall not be interpreted as agreement on the issue of compliance." (Akro. Decl. Exhs. KK & LL). The Addenda and these letters undercut Defendants' argument that the DCAA has approved Defendants' accounting practices.[25] Accordingly, summary judgment on such basis is not warranted at this time.[26]

---

25. In their Motion, Defendants challenge the addenda on the grounds that they arose from a completely unrelated dispute regarding Parsons' Employee Stock Ownership Plan costs and the interpretation of CAS 415. However, as stated above, the addenda also include a statement relating to indirect costs associated with pending False Claims Act litigation. Additionally, both Loesch and Susan Cole, General Counsel for Parsons, agree that the "pending False Claims Act litigation" language was intended to include this case. (Loesch Decl. ¶ 3, Pace Opp. Decl. Exh. V; Loesch Depo. at 103:7–13, Pace Opp. Decl. Exh. H; Deposition of Susan Cole ("Cole Depo."), 23:19–24:10, Pace Opp. Decl. Exh. J). Furthermore, in their Reply, Defendants state that "Parsons does not dispute the applicability of the Addenda to this action ...." (Defendants' Reply, 21:15–16). Defendants also state that their most significant basis for challenging the addenda is that the DCAA audited Parsons ES in 1998 specifically to evaluate Defendants' compliance with CAS 418. This argument is addressed below in section II.D.1.b.

26. Defendants further argue that "[t]his Court must defer to DCAA's interpretation of the CAS and FAR and the DCAA determination that the Parsons ES accounting practice that plaintiff challenges complies with those requirements" where, as here, the regulations are complex and highly technical. *See Dep't of Health & Human Servs. v. Chater*, 163 F.3d

### b. The 1998 Audit

Defendants also emphasize that, in 1998, the DCAA performed an audit of Parsons ES' accounting practices with particular focus on whether those practices complied with Cost Accounting Standard 418, which deals with the allocation of direct and indirect costs. Once again, Defendants point out that this audit was conducted after the instant lawsuit had been filed. Thus, Defendants again argue that, with full knowledge of Plaintiff's allegations, the DCAA audited Parsons ES and issued an audit report concluding that Parsons ES' accounting practices *complied* with CAS 418.

Defendants' argument regarding the 1998 audit is also unpersuasive. That audit report concluded, "[o]ur audit procedures disclosed no instances of noncompliance with CAS 418. However, instances of noncompliance not detected during this audit may be discovered during our continuous audit of contractor's cost accounting practices." (CAS 418 Audit Report, Akro. Decl. Exh. HH). Therefore, Defendants' claim that the DCAA found compliance

with Cost Accounting Standard 418 misconstrues its actual finding that it had *not* found *noncompliance.*

The evidence suggests, and Defendants argue, that DCAA auditors eventually learned of the existence of I & M (despite the fact that I & M was not included on the CASB Disclosure Statements). However, knowledge of the existence of I & M is not the equivalent of knowledge that Parsons ES was providing overhead and general administrative services and support for I & M. Furthermore, declarations of numerous DCAA auditors state that, to the best of their recollection, the DCAA never approved of Parsons ES' practice of excluding I & M labor costs from Parsons ES' direct labor base.[27] (Pace Opp. Decl. Exh. V, attached Decls. of Gill, Umade, Yen, Mayers, Haupt & Loesch at ¶ 2).

Ideally, a federal administrative agency will be responsive in informing a contractor as to whether it is in compliance with federal regulations. Indeed, given that Plaintiff's allegations in this action were

---

1129, 1133–34 (9th Cir.1998). However, this Court has found that the DCAA made no such determination. Therefore, it need not address Defendants' argument regarding deference. Furthermore, the Ninth Circuit agrees. *Oliver*, 195 F.3d at 463, n. 2 (stating that "[w]e note that the agency to which the allegedly false claim was submitted has not taken any position regarding any of the issues in this case, and thus no question of Chevron deference is presented.").

**27.** Attached to the Government's amicus brief are declarations by six DCAA employees. These declarations all contain the same language:

To the best of my knowledge and recollection, I have never analyzed, examined, or reached any conclusion regarding any of the following matters: Whether indirect cost pools of Parsons Engineering Science, Inc. (Formerly Engineering Science, Inc.) ("Parsons ES") should have been allocated in part to the labor that technicians hired by Inspection & Maintenance Corporation

("I & M") performed and charged directly to the contract between Parsons ES and the California Bureau of Automotive Repair ("the BAR Contract"); whether any of the indirect costs in any of Parsons ES' indirect cost pools had any beneficial or causal relationship to the direct labor charges made to the BAR Contract by the technicians hired by I & M to perform the BAR Contract ("the Technician Direct Labor Charges"); whether Parsons ES' failure to allocate any of its indirect costs to the Technician Direct Labor Charges or the BAR Contract violates the Cost Accounting Standards ("CAS"), the Federal Acquisition Regulations ("FAR"), or any other law, regulation or rule; or whether the allegations made by Janet Oliver in her lawsuit against Parsons have any merit. In addition, to my knowledge, DCAA has never concluded that the Technician Direct Labor Charges were properly excluded from the Parsons ES allocation base.

public knowledge, the DCAA, in its 1998 audit, should have specifically evaluated whether Parsons ES' exclusion of I & M labor from Parsons ES' direct labor base complied with the applicable Cost Accounting Standards. This Court, though, is not faced today with the question of whether the DCAA should have evaluated Parsons ES' accounting practices in order to conclusively determine compliance or lack thereof. The question that this Court is presented with is whether Parsons ES' accounting practices complied with federal regulations. When viewing the evidence in the light most favorable to Plaintiff, the DCAA did not determine that Parsons ES' accounting practices complied with CAS 418 or any other federal regulation, and summary judgment on such grounds is not warranted.[28]

### 2. Whether Parsons ES Was Entitled to the Money it Claimed And Was Paid by the Government

■■■ "It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674–75 (5th Cir.2003) (en banc) (citing *United States ex rel. Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir.1998) ("Costner I") ("[O]nly those actions by the claimant ... [calculated to] caus[e] the United States to pay out money it is not obligated to pay ... are properly considered 'claims' within the meaning of the FCA.")).

Relying on *Southland*, Defendants contend that they are not liable under the FCA, because Parsons ES was entitled, as a matter of law, to the amounts of overhead it claimed, and claims for monies to which a defendant is entitled are not actionable under the FCA. They contend that Parsons ES was in fact entitled to the money received from the government pursuant to their indirect expense claims (and related invoices) because, with full knowledge of Plaintiff's allegations that Parsons ES' accounting practices were illegal: "(1) the DCAA audited, approved and agreed that Parsons ES could bill the government the indirect expense rates it determined for fiscal years 1991–1997; (2) the DCAA never found the accounting practices Plaintiff challenges to violate CAS; and (3) the DCAA specifically found Parsons ES' accounting practices to comply with CAS 418." (Def. Mot. at 12:18–13:6).

Defendants arguments are not convincing. First, this Court has already addressed each of Defendants' points above and found that the DCAA did not conclusively determine that Parsons ES' accounting practices complied with the applicable federal regulations. Second, *Southland* is not, as Defendants contend, directly on point.

28. The Government agrees. In its Amicus Brief, it states,
"Defendants' argument is similar to arguments that routinely are raised by defendants in FCA cases. It boils down to this: 'The Government audited our rates, did not disapprove the cost allocations at issue, and therefore the Government must have approved those cost allocations.' However, absent proof that, at a minimum, Government administrative personnel in fact examined the cost allocations at issue, understood them, and approved them, Defen-

dants' argument must fail. Proof of what the auditors could have done, might have done, or even should have done is simply irrelevant.... Because there is no evidence that the Government has ever approved the exclusion of [I & M labor] from the Parsons ES [direct labor base], Defendants' assertions [are] incorrect."
(Government's Amicus Brief, Pace Opp. Decl. Exh. V at 9:1–20) (citing *United States v. Rogers*, 2001 WL 818160 *22, *23 (E.D.Tenn.)).

*Southland* involved apartment complex owners who had contracted with the U.S. Department of Housing and Urban Development ("HUD") to provide subsidized low-income housing. The apartment owners submitted monthly vouchers to HUD for payment. Submission of those vouchers required the owners to certify that the apartment units were "decent, safe, and sanitary." HUD's annual inspections revealed, however, that the apartments were not in "decent, safe, and sanitary" condition. Nevertheless, HUD continued to make payments to the apartment complex owners and to work with them in an attempt to improve conditions.

The *Southland* court held that, under the contract, the apartment owners continued to be entitled to the payments from HUD, despite the fact that they had been falsely certifying that the dwellings were decent, safe, and sanitary. The basis for this decision was that the contract explicitly addressed this situation and created a mechanism for HUD to address substandard housing conditions, which HUD declined to utilize. *Southland*, 326 F.3d at 675–76. Because the apartment owners were entitled to the amount of monies claimed, there was no FCA liability. *Id.* at 676 (stating that "whether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it. It is only those claims for money or property to which a [claimant] is not entitled that are 'false' for purposes of the [FCA].")

*Southland* is distinguishable from this case. Here, the amount to which Parsons ES was entitled was not set by contract, but was instead dependent upon the claims Parsons ES filed with the Government, and, in particular, the accounting practices used to calculate those claims. The Government only paid to Parsons ES the amount which Parsons ES claimed it was due based on its accounting practices. But, if Parsons ES' accounting practices violated the Cost Accounting Standards, then Parsons ES was *never entitled to* the extra monies it received. In other words, using the language of the *Costner* court, the government was never legally obligated to pay claims that were calculated using accounting practices that violated the applicable regulations. *Costner*, 153 F.3d at 677. Accordingly, summary judgment on the grounds that Parsons ES was entitled to the money it claimed is not warranted, and we are left with the central question in this case—whether Parsons ES' accounting practices complied with federal regulations. This Court has already determined that a genuine issue of material fact exists in that regard.

### 3. *Materiality*

 Although not yet determined by the Ninth Circuit, each Court of Appeals reaching the issue has, in addition to the FCA's explicit requirements, "inferred a requirement that the false statement or claim be material."[29] *United States v.*

---

**29.** *See, e.g., Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 (4th Cir. 1999) (stating that "liability under *each of the provisions of the False Claims Act* is subject to the further, judicially imposed requirement that the false statement or claim be material."); *United States v. Southland Mgmt. Corp.,* 326 F.3d 669, 679 (5th Cir.2003) (en banc) (Jones, J., concurring) ("There should no longer be any doubt that materiality is an element of a civil False Claims Act case. Our past precedent and every circuit that has addressed the issue have so concluded."); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir. 1997) (the FCA "interdicts material misrepresentations made to qualify for Government privileges or services.") (quoting *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456–461 (5th Cir.1977)); *United States ex rel. A + Homecare Inc. v. Medshares Mgmt. Group Inc., et al.,* 400 F.3d 428, 443 (6th Cir.2005) ("In sum, we conclude that a natural reading of the text ... supports the implication that

*President and Fellows of Harvard College,* 323 F.Supp.2d 151, 181–82 (D.Mass.2004). This Court finds, and the Plaintiff cites, no Circuit Court cases holding that materiality is not an element of sections 3729(a)(1) or (a)(2) of the FCA. Furthermore, at least one district court within this Circuit has held that materiality is a required element of a claim under the FCA. *See United States ex rel. Butler v. Hughes Helicopter Co.,* 1993 WL 841192, at *15 (C.D.Cal.) (stating that "[w]hile the Ninth Circuit has not explicitly ruled on the issue of whether or not alleged false statements must be material, it has so implied" and granting summary judgment to Defendants on the alternative ground that the statements at issue were not material), *aff'd on other grounds,* 71 F.3d 321 (9th Cir.1995). Accordingly, this Court finds that materiality is a required element of Plaintiff's claims under the FCA.

■■■ There are two potential standards by which materiality may be reviewed. The first view, referred to as the "natural tendency" test, is based on the general materiality standard laid out by the United States Supreme Court: "[A] concealment or misrepresentation is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the deci-sionmaking body to which it was addressed." *Kungys v. United States,* 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (internal citation omitted); *see also Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The second and more stringent materiality standard—the "outcome materiality" test—requires a showing that the allegedly fraudulent action had "the purpose and effect of causing the United States to pay out money it is not obligated to pay." *Costner,* 153 F.3d at 677. The difference between the two standards is that the natural tendency test focuses on "the potential effect of the false statement," while the outcome materiality test focuses on the actual effect of the false statement. *Harrison,* 352 F.3d at 915–17. This Court agrees with the Fourth and Sixth Circuits that the "natural tendency" test is the appropriate standard for materiality in the context of the FCA. The Sixth Circuit's analysis of the issue in *A + Homecare* is convincing.[30] In addition, because this case involves a Government agency that did not function as effectively as it should have, the following comments of the *Harvard* court are particularly relevant:

Evidence of the government's actual *conduct* is less useful for FCA purposes

the FCA imposes liability only for false statements or conduct which are material to a false or fraudulent claim for money or property from the Government."); *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 732 (7th Cir. 1999) (affirming dismissal of qui tam FCA claims because the relator failed to demonstrate that the omission of the test at issue was material to the buying decision of the United States); *United States ex rel. Costner v. URS Consultants, Inc.,* 317 F.3d 883, 886–87 (8th Cir.2003) (noting that Eighth Circuit precedent implies a materiality standard stricter than mere relevancy); *United States v. TDC Mgmt. Corp.,* 24 F.3d 292, 298 (D.C.Cir. 1994) (concluding that the plaintiff in a FCA action must prove the omitted information at issue was material).

30. First, the Court stated that the natural tendency test is "more consistent with the plain meaning of the [FCA], which attaches liability upon *presentment* of a false or fraudulent claim, rather than *actual payment* on that claim." *A + Homecare,* 400 F.3d at 445. Second, liability under the FCA is punishable by a civil penalty even if the Government sustained no actual damages. *Id.* Third, the Supreme Court has stated that the FCA should be construed broadly to cover "all fraudulent *attempts* to cause the Government to pay out sums of money." *Id.* (quoting *United States v. Neifert-White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)).

than evidence of the government's legal *rights* .... Materiality must turn on how [the government] was *authorized* to respond to such failures, or else violation of identical provisions in separate cases could have different materiality results based on the predilections of particular program or accounting staff.

323 F.Supp.2d at 186.

"The question of materiality is a mixed question of law and fact." *Harvard,* 323 F.Supp.2d at 182 (citing *United States ex rel. Harrison v. Westinghouse Savannah River Co.,* 352 F.3d 908, 914 (4th Cir. 2003)). Under the FCA, a plaintiff bears the burden of establishing the element of "materiality." *Southland,* 326 F.3d at 679 (Jones, J., concurring). Defendants contend that Plaintiff has not met this burden with respect to the indirect expense rate claims or the alleged misrepresentations in the Parsons ES certified CASB Disclosure Statements.

### (a) Indirect Expense Rate Claims

Defendants contend that Plaintiff cannot establish the element of materiality with respect to the indirect expense rate claims, because DCAA has approved the claims calculated using the accounting practice Plaintiff challenges and has never required a different accounting practice. This Court has already addressed in detail, and rejected, Defendants' arguments regarding the DCAA's supposed "approval" of Parsons ES' accounting practice. Furthermore, Plaintiff has introduced evidence that Parsons ES submitted claims that were inflated, because it used an accounting practice that violated the Cost Accounting Standards. If this is true, the fact that it did so influenced the amount that the Government paid to Parsons ES based on those claims. In other words, the amount that the Government paid to Parsons ES depended entirely on the accounting practice that Parsons ES employed in calculating its indirect expense rate. In fact, Defendants have stipulated that:

> For the years 1989–1997, the overhead rates which ES and Parsons ES utilized for cost reimbursement vouchers, progress payment invoices, and certifications of costs submitted to the United States Government would have been lower if the I & M technician labor was included in the direct labor base utilized to compute the ES and Parsons ES overhead rates and overhead amounts submitted to the United States Government and paid by the United States Government in a total sum of $6 million.

(Supp. Jt. Stip. No. 121, Akro. Decl. Exh. B). Therefore, summary judgment is not warranted.

### (b) Alleged Misrepresentations in Parsons ES' certified CASB Disclosure Statements

Defendants also contend that they are entitled to summary judgment on Plaintiff's allegations regarding Parsons ES' CASB Disclosure Statements, because Plaintiff cannot establish that the alleged misrepresentations were material. Once again, Defendants argue primarily that the DCAA "requested, understood, and approved ... the form of language in the CASB Disclosure Statement," citing a 1994 meeting between Defendants and DCAA personnel. Defendants also claim that DCAA Supervisory Auditor Michal Kerestes "has admitted that the DCAA *was never misled* by the Disclosure Statement language ...." Lastly, Defendants cite the letters from William E. Loesch and Nancie Peake, DCAA Administrative Contracting Officers, which state, "[b]ased upon a review for accuracy, [I have determined that the CASB Disclosure Statement] adequately describe[s] the cost accounting practices of [Parsons ES]." (Akro. Decls.

Exhs. JJ, KK, & LL). Defendants argue, therefore, that the alleged false statements within the CASB Disclosure Statements could not have influenced any determination by the DCAA and, thus, were not material.

Defendants misconstrue this evidence—it does not support Defendants' claim that the alleged false statements within the CASB Disclosure Statements were immaterial. The deposition testimony of Dan Schiff, a Parsons executive, reveals that the particular transfers between I & M and Parsons ES were not discussed at the meeting to which Defendants refer. (Schiff Depo. II at 22:14–17, Akro. Decl. Exh. OO). Also, Michal Kerestes' declaration does not state that the Government was not misled by the non-inclusion of I & M. Rather, the testimony cited simply states that: "I asked Dan Schiff of Parsons for a list of the Parsons companies with which Parsons ES engaged in interorganizational transfers. I understood that the list [submitted by Schiff] ... was a partial response to my inquiry. I never received any complete response to my inquiry, and to my knowledge no one else at DCAA did either." (Kerestes Decl. ¶ 3, Akro. Decl. Exh. F). Lastly, the letters from Loesch and Peake go on to state that "a disclosed practice shall not by virtue of such disclosure, be deemed to be proper, approved, or agreed to practice ...." (Akro. Decl. Exhs. JJ, KK, & LL). Once again, viewing this evidence in the light most favorable to Plaintiff, the Government did not approve the language in the CASB Disclosure Statements.

Additionally, the question here is not whether the Government actually was misled. The question is whether the omission of I & M was "capable of influencing" the Government's decision to pay the overcharged amount. If Parsons ES had listed I & M in those statements, the DCAA may have challenged the exclusion of I & M

labor form Parsons ES' direct labor base. Therefore, a genuine issue of material fact exists as to whether the omission of I & M was a material omission and summary judgment to the contrary is not warranted at this time.

Defendants' Motion for Summary Judgment is denied.

### 4. *Defendants' Request for an Order Limiting Plaintiff's Potential Damages*

In the case that this Court does not grant Defendants' Motion for Summary Judgment, Defendants alternatively seek an order pursuant to Fed.R.Civ.P. 56(d) limiting any liability to civil penalties for the two Parsons ES Disclosure Statements that Plaintiff claims were falsely certified. Defendants seek protection from liability for "a $5,000 to $10,000 civil penalty" for each of the 4,056 allegedly false indirect expense rate claims using the accounting practice at issue, because the " 'including but not limited to' and 'at cost' language (to which plaintiff objects) appears only in Parsons ES' Disclosure Statements, and does not appear in the 4,056 Parsons ES indirect expense rate claims, proposals, and invoices that plaintiff also alleges are 'false' claims." (Def. Mot. at 22:7–13). Furthermore, relying on *Southland*, Defendants argue that Plaintiff's contention "that each of Parsons ES' 4,056 indirect expense rate claims, proposals and invoices is a false claim because Parsons ES could only do business with the United States Government ... if it had certified CASB Disclosure Statements is overbroad and unsupported by relevant law."

Defendants at this time provide no legal support whatsoever for their request. They also ignore that one of Plaintiff's theories is that each of Parsons' ES claims was false, because the accounting practice that Parsons ES used to calculate its indirect expense rate claims violated the applicable federal regulations and Cost Ac-

counting Standards. The FCA provides that any party found to have violated 31 U.S.C. §§ 3729(a)(1) through (a)(7) is "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000" per claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C § 3729(a); *see also United States v. Mackby*, 339 F.3d 1013, 1017–18 (9th Cir.2003). The parties have stipulated that Parsons ES submitted 4,056 cost reimbursement vouchers, progress payment invoices, and certifications of costs utilizing the allegedly "false or fraudulent" accounting practice. (Supp. Jt. Stip. Nos. 116–118, Akro. Decl. Exh. B). The Parties have also stipulated as follows:

For the years 1989–1997, the overhead rates which ES and Parsons ES utilized for cost reimbursement vouchers, progress payment invoices, and certifications of costs submitted to the United States Government would have been lower if the I & M technician labor was included in the direct labor base utilized to compute the ES and Parsons ES overhead rates and overhead amounts submitted to the United States Government and paid by the United States Government in a total sum of $6 million.

(*Id.* at No. 120). This Court has already ruled that genuine issues of material fact exist as to whether the accounting practice at issue violated the applicable federal regulations and Cost Accounting Standards. Thus, while any "punitive" civil sanctions ultimately awarded will be subject to analysis under the Excessive Fines Clause, an order limiting Defendants' liability would at this point be premature. *See United States v. Mackby*, 261 F.3d 821, 830 (9th Cir.2001) (concluding that "the civil sanctions provided by the False Claims Act are subject to analysis under the Excessive Fines Clause because the sanctions represent a payment to the government, at least in part, as punishment."). Defendants' al-

ternative motion for an order limiting Plaintiff's potential damages is denied without prejudice. However, Plaintiff should not take comfort in this ruling, since it would appear that a reasonable interpretation of the False Claims Act with respect to the Disclosure Statements dated February 2, 1992 and May 27, 1994 would give rise to only two (2) claims not 4,056 separate claims. For example, if Plaintiff were to prevail as alleged her damages would be calculated as follows: two times $5,000 to $10,000 plus three times the amount of damages which the Government sustains, because of the act of the wrongdoer.

If the Court were to award damages based upon Plaintiff's interpretation of damages, the result would be absurd. For example, Plaintiff would be requesting the Court to make the following calculation: 4,056 claims times $5,000 to $10,000 plus three times the amount of damages the Government sustains, because of the act of the wrongdoer. Plaintiff's interpretation of damages under the False Claims Act would amount to astronomical damages and cannot logically be what Congress intended.

### III. *Conclusion*

Based on the foregoing, this Court (1) **Grants in part** and **denies in part** Plaintiff's Motion for Summary Judgment; (2) **Denies** Defendants' Motion for Summary Judgment; and (3) **Denies without prejudice** Defendants' alternative Motion for an Order Limiting Plaintiff's Potential Damages.

This Court further orders a Pretrial Conference and Trial Setting Conference on January 29, 2007 at 10:00 a.m.

IT IS SO ORDERED.